## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**RYAN TRAHAN, individually**
**And on behalf of the Estate of**
**Misty Trahan**

**VERSUS**

**TRANSAMERICA LIFE**
**INSURANCE COMPANY**

CIVIL ACTION

NO.  18-1085-JWD-EWD

## RULING AND ORDER

This matter is before the Court on the *Motion for Summary Judgment of Transamerica Life Insurance Company*, ("*Motion*") filed by Defendant, Transamerica Life Insurance Company ("Defendant" or "Transamerica"). (Doc. 16.) Plaintiff, Ryan Trahan, individually and on behalf of the Estate of Misty Trahan, ("Estate") opposes the *Motion*. (Doc. 18.) Transamerica has filed a reply. (Doc. 19.) Oral argument is not necessary. Having considered the arguments raised by the parties, the facts, the applicable law, and for the reasons expressed below, the *Motion* is denied in part and granted in part.

## BACKGROUND AND FACTS

*a.   Procedural history*

Ms. Misty Trahan ("Ms. Trahan") passed away from congestive heart failure on December 26, 2016. The Plaintiff in this case, Mr. Ryan Trahan, is Ms. Trahan's surviving son and the executor of her estate (hereinafter the "Estate"). After Ms. Trahan's untimely death, the Estate made a claim for payment of the proceeds of a Life Insurance Policy written by the Transamerica. (Doc. 1-1 at ¶ 7.) On December 13, 2017, Transamerica rescinded the Policy, concluding that Ms. Trahan had made material misrepresentations with the intent to deceive Transamerica into issuing the Policy. (Doc. 16-5, Transamerica's letters of June 12, 2017 and

December 13, 2017, respectively.) The Estate filed suit in the 23rd Judicial District for the State of Louisiana alleging breach of an insurance contract. (Doc. 1-1.) Transamerica removed the matter to this Court, and filed an answer including the affirmative defense of rescission due to material misrepresentations made with the intent to deceive under Louisiana Revised Statute 22:860. (Doc. 9.) Transamerica now seeks summary judgment in its *Motion for Summary Judgment* based on this affirmative defense.

b. *Ms. Trahan's relevant medical history, laboratory tests and diagnostic studies, and treatment for her thyroid condition.*

In June 1994, Dr. Joel Silverberg ("Dr. Silverberg") began treating Ms. Trahan for a thyroid condition as a result of her Graves Disease. (Doc. 16-4, Deposition of Dr. Joel Silverberg, at p. 10:14 through p. 11:12.) At that point, Ms. Trahan's thyroid was enlarged, her Thyroid Stimulating Hormone ("TSH") level was "marginally low" (0.27), and her T4 level was "high end normal," (*Id.* at 17:4-5). From 1994 to 2008 Dr. Silverberg was Ms. Trahan's treating physician relating to her thyroid condition. (*Id.* at 13:4-5.) After a four-year break in treatment, on January 30, 2013, Dr. Silverberg saw Ms. Trahan and both her TSH and T4 levels were normal, and she was not having any symptoms of hypothyroidism. (*Id.* at 18:10-18, 19:20-23). In May 2013, Dr. Silverberg began prescribing Ms. Trahan a "very tiny dose of methimazole to normalize her levels." (*Id.* at 23:1-2.)

On December 15, 2014, after a motor vehicle accident, Ms. Trahan was treated at the emergency department of Our Lady of the Lake Hospital. During this treatment, a CT scan detected a "2.5-centimeter mass in her left thyroid lobe." (Doc. 16-5, Medical Records of Oak Grove Family Practice, at 38-41 (authenticated by Doc. 16-5, Declaration of Jennifer High, ¶5).) Following up on this nodule, and the advice of the emergency room treating physician, Ms. Trahan saw Dr. Flood in January 2015. (*Id.* at 19-32.) Dr. Flood ordered tests of Ms. Trahan's

thyroid, including an ultrasound and a fine needle aspiration, which is a biopsy with imaging guidance on the left thyroid nodule. (*Id.* at 31-32.)

On March 12, 2015, Ms. Trahan returned to Dr. Flood for conditions relating to her thyroid. (*Id.* at 10-18.) Dr. Flood prescribed Armour Thyroid, which treats hyperthyroidism. (Doc. 16-5 at 12.) Dr. Flood then recommended that she return with a follow up visit in four months with laboratory tests to be taken, and to follow up sooner if the symptoms persisted or worsened. (*Id.*)

Ms. Trahan saw Dr. Silverberg on March 30, 2015. (Doc. 16-4, Deposition of Dr. Joel Silverberg, at pp. 25:13–22; 26:2–13, 29:1–16; Medical Records attached to the Deposition of Dr. Silverberg, at 17-24.)  He studied her FNA test and a TSH blood test, which indicated that her thyroid levels were normal. (*Id.* at 17.) The thyroid nodule was "concerning" to Dr. Silverberg because "the risk of cancer in a person who has a history of Graves' disease and develops a thyroid nodule is a little higher than that of a routine thyroid nodule." (*Id.* at 26:7-10.) Dr. Silverberg explained to Ms. Trahan that the nodule should be followed clinically. (*Id.* at 29:9-10.)

Six months later, on September 8, 2015, Ms. Trahan saw Dr. Flood for a follow-up appointment relating to her thyroid condition. (Doc. 16-5, Medical Records of Oak Grove Family Practice, at 4-9, 25, 27-28.) The following day, Ms. Trahan had lab tests performed, and on September 16 had an ultrasound. (*Id.*) After reviewing the results, Dr. Flood recommended a biopsy, which was performed on September 21, 2015 at the Baton Rouge Radiology and Imaging Center. (Doc. 16-4, Medical Records of the Baton Rouge Clinic, attached to the Deposition of Dr. Joel Silverberg, at 23; see also Doc 16-4, Deposition of Dr. Joel Silverberg, at pp. 34:25–36:24.) The biopsy results indicated that the thyroid nodule was growing. (*Id.*)

On October 21, 2015, Ms. Trahan reported symptoms including fatigue, constipation, weight gain, and hair loss to Dr. Silverberg while on levothyroxine and Armour Thyroid. (Doc. 16-4, Deposition of Dr. Joel Silverberg, at pp. 30:3–21, 31:19–32:2; Medical Records attached to the Deposition of Dr. Silverberg, at 18.) On October 23, 2015, Ms. Trahan returned to Dr. Silverberg to undergo blood tests, and expressed a concern that "her thyroid is growing." (*Id.* at pp. 32:3–33:22, 34:5–24; *see also* Doc. 16-4, Medical Records attached to the Deposition of Dr. Silverberg, at 19.) Dr. Silverberg instructed Ms. Trahan to stop taking the levothyroxine and Armour Thyroid in order to allow her thyroid function to reach a "steady state," and for Ms. Trahan to return for a follow-up visit in five to six weeks. (*Id.*)

Ms. Trahan next saw Dr. Silverberg on December 1, 2015. (*Id.* at pp. 34:5–24, 36:18–38:17, 42:16–22; Doc. 16-4, Medical Records attached to the Deposition of Dr. Silverberg, at 19-21.) During this visit, Ms. Trahan was "very focused on her weight." (Doc. 16-4, Deposition of Dr. Joel Silverberg, at 34:10-18.) Dr. Silverberg ordered a thyroid ultrasound, which was performed on December 14, 2015. (Doc 16-4, Deposition of Dr. Joel Silverberg, at pp. 36:18–38:17, Doc. 16-4, Medical Records attached to the Deposition of Dr. Silverberg, at 19-21 and 24.)

Dr. Silverberg called Ms. Trahan on December 17, 2015, to discuss the results of the ultrasound. Dr. Silverberg stated that the ultrasound revealed "the beginnings of conflicting evidence that the nodule was growing," which is "a little bit bothersome, not terribly but a little bit." (Doc. 16-4 at 38:25-39:16.) In December 2015, Dr. Silverberg did not recommend surgery, but he stated that "if this thing continued to grow, yes, it (surgery) was going to be put on the table." (Doc. 16-4 at 39:19-22.) As of his last visit with Ms. Trahan, on December of 2015, no surgery had been scheduled for Ms. Trahan, and he had never advised or recommended her to

have surgery. (Doc. 16-4 at 50:14-51:2.) Dr. Silverberg's office records state, "I will see her in the spring and repeat her ultrasound – if we see continued growth, we need to discuss surgery; discussed in detail, . . . ." (Doc. 16-4, Medical Records attached to the Deposition of Dr. Silverberg, at 21.)

On December 23, 2015, Ms. Trahan called Dr. Silverberg and reported that she was "experiencing more symptoms" and had gained five pounds in a single week. (Doc 16-4, Deposition of Dr. Joel Silverberg, at pp. 40:8-19, 41:16-42:25; *see also* Doc. 16-4, Medical Records attached to the Deposition of Dr. Silverberg, at 21-22.)  Ms. Trahan was hyper-focused on her weight.

On February 4, 2016, Ms. Trahan set up an appointment with Dr. Kandil and faxed her medical records to his office so that he would have them in advance of her appointment. (Doc. 16-6, Deposition of Dr. Emad Kandil, at pp. 7:20-9:5, 11:4–5; Medical Records attached to the Deposition of Dr. Kandil, at 25; Facsimile Transmission from Ms. Trahan, attached to the Deposition of Dr. Kandil.) Ms. Trahan saw Dr. Kandil on February 19, 2016 for a consultation regarding the thyroid nodule. (Doc. 16-6, Medical Records attached to the Deposition of Dr. Kandil, at 25) Dr. Kandil ordered genetic testing of the thyroid nodule on March 22, 2016 and after reviewing the results of the testing, he was "still not 100 percent confident" it was "cancer," and that "its only 40 percent (at that time)" because "benign nodules can grow too." (Doc. 16-6 at 16:2-9, 17:13-22.) Dr. Kandil recommended a repeat biopsy because of the continuing growth of the thyroid nodule, which occurred on March 7, 2016. 1. (Doc 16-6, Deposition of Dr. Emad Kandil, at pp. 11:4-24, 12:9-13:7, 17:2-12, 18:12-21:24, 31:7-13, 33:10-35:1; Medical Records attached to the Deposition of Dr. Kandil, at 20.)

On March 21, 2016, Ms. Trahan saw Dr. Kandil to discuss the biopsy results. (Doc 16-6, Deposition of Dr. Emad Kandil, at pp. 35:2-36:23; Medical Records attached to the Deposition of Dr. Kandil, at 20-24.) The biopsy revealed continued growth in Ms. Trahan's thyroid nodule, and there was a possibility that the nodule was cancerous. (*Id.*) Dr. Kandil explained that the only way to know whether the nodule was in fact cancerous was to perform surgery to remove part of the thyroid gland. (*Id.*) Therefore, **on** March 31, 2016, Ms. Trahan had left-thyroid lobectomy surgery by Dr. Kandil. (Doc 16-6, Deposition of Dr. Emad Kandil, at pp. 36:24-42:8; Doc. 16-6, Medical Records attached to the Deposition of Dr. Kandil, at 29-31.) The pathological results of the surgery revealed that Ms. Trahan had minimally invasive follicular carcinoma, or thyroid cancer, which was diagnosed on April 5, 2016. (Doc 16-6, Deposition of Dr. Emad Kandil, at pp. 53:20-25.)

On April 8, 2016, Dr. Kandil met with Ms. Trahan to discuss the cancer diagnosis. (Doc. 16-6, Deposition of Dr. Emad Kandil, at pp. at pp. 42:10-43:10; Medical Records attached to the Deposition of Dr. Kandil, at 15-19.) This was the first time that a doctor diagnosed Ms. Trahan with cancer. (*Id.*) Dr. Kandil advised Ms. Trahan to undergo a complete right thyroid lobectomy to remove her right-side thyroid gland. (*Id.*) Ms. Trahan agreed, and the procedure took place on April 28, 2016. (*Id.*)

c.  *Ms. Trahan's application for a life insurance policy with Transamerica*

On February 18, 2016, the day before her initial appointment with Dr. Kandil, Ms. Trahan applied for a life insurance policy with Transamerica ("Policy"), initially requesting a face amount of coverage of $200,000. (Doc 16-5, Declaration of Jennifer High, ¶6 (attaching and authenticating, the Policy including the attached Application).) In response to Question 5(f) of Ms. Trahan's application for the Policy ("Application"), she disclosed: (1) she had a "thyroid disorder," (2) had been treated by Dr. Silverberg, (3) that she had been prescribed "meds off and

on," and (4) that she was off medication at that time. (Doc. 16-5, Policy with attached

Application, at 63.) Ms. Trahan responded "No" to Question 5(i) in the Application, which asked

whether she had ever been diagnosed with or treated for a "[c]ancer, tumor, polyp or cyst"; "No"

to Question 7(b) in the Application, which asked whether she "[h]ad or been advised to have an

X-ray, electrocardiogram, laboratory test or other diagnostic study" within the past five years;

and "No" to Question 7(d) in the Application, which asked whether she "[h]ad or been advised to

have a surgical procedure" within the past five years. (Doc. 16-5, Policy with attached

Application, at 63.)

On March 24, 2016, while the Application was pending with Transamerica, Ms. Trahan

requested an increased death benefit of $300,000. (Doc. 16-7, Rule 30(b)(6) Corporate

Deposition of Transamerica, at pp. 34:9–18, 78:20–79:15; see also Doc. 16-5, Declaration of

Jennifer High, ¶7 (attaching and authenticating, March 24, 2016 email requesting increase to

$300,000); Doc. 16-5 at 67.)

Ms. Trahan's Application contains a paragraph that states:

> **I, the Proposed Insured, and I, the Owner if different, hereby represent** that
> the statements and answers given in this application are true, complete and correctly
> recorded. **I/we agree** . . . any contract issued on this application shall not take effect
> until after all of the following conditions have been met: (a) the full first premium
> is paid in full, (b) the Owner has personally received the contract during the lifetime
> of and while the Proposed Insured is in good health, and (c) all of the statements
> and answers given in this application must be true and complete as of the date of
> Owner's personal receipt of the contract and that the contract will not take effect if
> the facts have changed.

(Doc. 16-5, Policy with attached Application, at 59.)

In reliance on the information disclosed in the Application, Transamerica issued the

Policy with a face amount of $300,000.00, on May 2, 2016. The Policy had an effective date of

June 7, 2016. (Doc. 16-5, ¶6; Doc. 16-5, ¶8–9 (attaching and authenticating, May 20, 2016

Policy Delivery Receipt, at 68 and Policy Placed in Force Form at 69); Doc. 16-5, Policy

Delivery Receipt, at 68; Doc. 16-5, Policy Place in Force Form, at 69.) Ms. Trahan passed away

within the Policy's contestability period. (Doc. 16-7, Rule 30(b)(6) Corporate Deposition of

Transamerica, at pp. 84:25–85:9.)

*d. Transamerica's decision to rescind the life insurance policy*

On December 13, 2017, Transamerica rescinded the Policy, after concluding that Ms.

Trahan had made material misrepresentations with the intent to deceive Transamerica into

issuing the Policy. (Doc. 16-5, Transamerica's letters of June 12, 2017 and December 13, 2017,

at 70-77.) Had Ms. Trahan truthfully answered the questions in the application, Transamerica

would not have issued the Policy (Doc. 16-7, Rule 30(b)(6) Corporate Deposition of

Transamerica, at pp. 49:7–16, 59:22–60:20; 112:4–7, 121:23–123:15; *see also* Doc. 16-7,

Underwriting Guidelines, attached to Rule 30(b)(6) Corporate Deposition of Transamerica, at

37-40.)  Transamerica would not have issued the Policy because its underwriting guidelines set

out that consideration of an application should be postponed, and only re-considered after further

evaluation, if the applicant has been diagnosed with abnormal cervical lymph nodes, a solid

thyroid nodule that measures greater than 1.0 centimeter, or a solid thyroid nodule with

suspicious ultrasound features. (Doc. 16-7, Rule 30(b)(6) Corporate Deposition of Transamerica,

at pp. 121:23–123:15; Doc. 16-7, Underwriting Guidelines, attached to Rule 30(b)(6) Corporate

Deposition of Transamerica, at 37-40); Doc. 16-8, Declaration of Michael Shepard, ¶¶5–6.)

Therefore, if Ms. Trahan had disclosed that on February 18, 2016, she had undergone diagnostic

tests that revealed a 2.5 cm thyroid nodule, then Transamerica, applying the underwriting

guidelines, would not have issued the Policy. (*Id.*)

Furthermore, as of June 7, 2016, Ms. Trahan was not eligible for coverage pursuant to

Transamerica's underwriting guidelines. Although, Ms. Trahan did not update her Application

prior to the issuance of the Policy to disclose that she had undergone two surgeries and had been

diagnosed with thyroid cancer, the guidelines indicate that when an applicant has been diagnosed with a tumor, issuance of the policy should be postponed until the passage of one year from the completion of any surgery, radiotherapy and chemotherapy. (Doc. 16-8, Declaration of Michael Shepard, at ¶7; Doc. 16-7, Underwriting Guidelines, attached to Rule 30(b)(6) Corporate Deposition of Transamerica, at 37.)

## RELEVANT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotation marks omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations omitted).

## DISCUSSION

*a.  Parties' arguments*

1. Transamerica's arguments

   A. *Louisiana Revised Statute 22:860 governs this dispute*

Transamerica argues that Louisiana Revised Statutes 22:860 provides the legal standard

for this dispute. Specifically, Transamerica points the Court to Louisiana Revised Statute

22:860(B), which states:

> B. In any application for life, annuity, or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless either one of the following is true as to the applicant's statement:
>
> > (1) The false statement was made with actual intent to deceive.
> >
> > (2) The false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer under the policy.

Louisiana Revised Statute 22:860(B). As such, Transamerica maintains that a policy is void ab

initio if it proves the applicant's misrepresentation was (1) material, and (2) made with intent to

deceive. (Doc. 16-1 at 16 (citing *Jamshidi v. Shelter Insurance Company*, 471 So. 2d 1141 (La.

App. 3 Cir. 1985); *Shelter Ins. Co. v. Cruse*, 446 So. 2d 893 (La. App. 1 Cir. 1984)).)

Transamerica argues that under Louisiana law, "[a] misrepresentation is material if the

truth would have resulted in the insurer not issuing the policy of insurance or issuing the policy

at a higher rate." (Doc. 16-1 at 17 (quoting *Gwin v. Liberty Mut. Ins. Co.*, No. 16-1222, 2017

U.S. Dist. LEXIS 131944, at *14 (W.D. La. Aug. 17, 2017)).) Further, Transamerica asserts that

intent to deceive "is determined from circumstances indicating the insured's knowledge of the

falsity of the representations made in the application." (*Id.* (quoting *Kahl v. Chevalier*, 15-1028,

p. 9 (La. App. 3 Cir. 03/23/16), 188 So. 3d 449, 455).) Transamerica argues that intent to deceive

can be inferred from the circumstances and that the Court should consider "the extent of the

applicant's misrepresented medical treatment as indicative of an intent to deceive." (Doc. 16-1 at

17 (citing *Jordan v. Life General Security Ins. Co.*, 333 So. 2d 732 (La. App. 4 Cir.), *writ denied*,

337 So. 2d 219 (La. 1976)).)

       B.   <u>When the Application was submitted it contained material misrepresentations</u>
           <u>made with the intent to deceive.</u>

Transamerica argues that Ms. Trahan made a material misrepresentation with the intent to

deceive when she responded "No" to Question 7(b) in the Application. Question 7(b) states: "7.

OTHER THAN WHAT YOU HAVE ALREADY DISCLOSED, WITHIN THE PAST FIVE

YEARS HAVE YOU: . . .  b. Had or been advised to have an X-ray, electrocardiogram,

laboratory test or other diagnostic study?" (Doc. 16-1 at 18.)

Transamerica asserts that the undisputed material facts show Ms. Trahan misrepresented

the truth when she stated that she had not been advised to have a laboratory test or diagnostic

study in the past five years because she had numerous tests and was scheduled to have additional

ones. (Doc. 16-1 at 19.) Specifically, Ms. Trahan did not disclose the:

> blood tests, including a thyroid-specific blood test known as a TSH, ultrasounds,
> and thyroid biopsies for the purpose of detecting thyroid cancer, in December 2014,
> January 2015, March 2015, September 2015, and December 2015, . . . [and] the
> additional [anticipated] studies in the spring of 2016.

(Doc. 16-1 at 19 (citing Doc. 16-4, Deposition of Dr. Joel Silverberg, at pp. 10:22–12:24, 29:1–

13, 30:3–11, 34:25–37:4; Doc. 16-4, Medical Records attached to the Deposition of Dr. Joel

Silverberg, at 19-21, 23, 24; Doc. 16-5, Medical Records of Oak Grove Family Practice, at 4-

41).) Transamerica point out that Ms. Trahan filled out the Application the day before an

appointment scheduled with a surgeon to discuss her thyroid. (Doc. 16-1 at 19.)

Transamerica argues that this misrepresentation was material because Transamerica

would not have issued the Policy to Ms. Trahan if she had accurately responded to Question 7(b).

(Doc. 16-1 at 20 (citing (Doc. 16-7, Rule 30(b)(6) Corporate Deposition of Transamerica, at pp.

59:22–60:9, 61:16–24, 77:7–17).) Transamerica points to the Transamerica Corporate

Representative deposition in which she states, "[T]he policy was approved based upon the information that she provided to us. If she had been forthcoming and told us that she had had x-rays and diagnostic testing done in December, two months prior to filling out the application, the . . . application wouldn't have been approved." (*Id.*) Further Transamerica points out that the underwriting guidelines detail that if there is a diagnosis of "abnormal cervical lymph nodes, a solid thyroid nodule that measures greater than 1.0 centimeter, or a solid thyroid nodule with suspicious ultrasound features," then Transamerica should postpone consideration of an application until after further evaluation. (Doc. 16-1 at 20 (citing Doc. 16-8, Declaration of Michael Shepard, ¶¶5–6; Doc. 16-7, Underwriting Guidelines, attached to Rule 30(b)(6) Corporate Deposition of Transamerica, at 37-40).) Therefore, Transamerica states that had Ms. Trahan disclosed her diagnostic testing and/or the thyroid nodule, it would not have issued the Policy. (Doc. 16-1 at 20-21.)

Transamerica argues that the undisputed material facts show that Ms. Trahan's material misrepresentation was made with intent to deceive because the extent of the misrepresented medical treatment is staggering. (Doc. 16-1 at 21.) Transamerica points to the medical treatment not disclosed including that: (1) Ms. Trahan had been diagnosed with a growing thyroid nodule; (2) she had undergone diagnostic tests and other studies on the nodule; (3) her endocrinologist indicated he wanted to do more testing; (4) the Application was submitted the day before Ms. Trahan's appointment to discuss surgical options relating to the thyroid nodule; and (5) she had gone off her thyroid medication to level out for further testing, including to determine whether the nodule was cancerous. (Doc. 16-1 at 21 (citing Doc 16-4, Deposition of Dr. Joel Silverberg, at pp. 25:13–26:13, 29:1–13, 30:3–21, 31:19– 33:22, 34:5–24, 36:18–37:17, 38:18–39:16; Doc. 16-4, Medical Records attached to the Deposition of Dr. Joel Silverberg, at 17-24).)

Transamerica states that without this information, the Application suggests that Ms. Trahan's thyroid condition was no longer an issue.

Transamerica argues that Louisiana law rigidly holds insurance applicants to their word to find intent to deceive at summary judgment where the application omits disclosure of personal history. (Doc. 16-1 at 22 (citing *Davis v. State Farm Mutual Auto. Ins. Co.*, 415 So. 2d 501, 504 (La. App. 1 Cir. 1982) ("inconceivable" that an applicant could misunderstand question about prior traffic violations); *Jordan v. Life Gen. Sec. Ins. Co.,* 333 So. 2d 732 (La. App. 4 Cir.), *writ denied*, 337 So. 2d 219 (1976) ("incomprehensible that anyone could have received the regimen of medical treatment administered to the decedent and blandly deny having 'received medical attention for any . . . physical . . . condition' without intending to deceive.")).) Therefore, Transamerica urges the Court to grant summary judgment upholding the decision to rescind Ms. Trahan's life insurance policy because there are no genuine issue of material fact as to whether Ms. Trahan made a material misrepresentation with intent to deceive. (Doc. 16-1 at 23 (citing *Federal Deposit Ins. Corp. v. Duffy*, 47 F.3d 146 (5th Cir. 1995); *U.S. Life Ins. Co. v. Watts*, 199 F. Supp. 2d 492 (E.D. La. 2001) (Lemmon, J.); *James v. Allstate Life Ins. Co.*, No. 96-3324, 1997 U.S. Dist. LEXIS 15572 (E.D. La. Oct. 3, 1997) (Duval, J.); *Watson v. United of Omaha Life Ins. Co,*, 735 F. Supp. 684 (M.D. La. 1990) (Polozola, J.); *Rowe v. Metropolitan Life Ins. Co.*, No. 00-2211, 2001 U.S. Dist. LEXIS 8571 (E.D. La. 2001) (Barbier, J.)).)

> C. *Ms. Trahan's responses to Questions 5(i) and 7(d) were not true and complete as of the date Ms. Trahan received the policy.*

In addition, Transamerica argues that the undisputed material facts show that Ms. Trahan's answers to the questions in the Application were not true and complete when she received the Policy on May 20, 2016. (Doc. 16-1 at 23.) On February 19, 2016, Ms. Trahan responded "No" to Question 5(i), which asked if she had been diagnosed with "cancer, tumor,

polyp, or cyst" and to Question 7(d), which asked if, other than what she had already disclosed,

had she been advised to have a surgical procedure. (Doc. 16-1 at 23-24.) From February 19, 2016

until May 20, 2016, Ms. Trahan was diagnosed with thyroid cancer and advised to have surgery

on two occasions and underwent surgery on her thyroid.  (Doc. 16-1 at 24 (citing Doc. 16-6,

Deposition of Dr. Emad Kandil, at pp. 35:2–36:23, 39:5–43:10).) The terms of Application as

incorporated into the Policy state that the Policy:

> shall not take effect until after all of the following conditions have been met: . . .
> (c) all of the statements and answers given in this application must be true and
> complete as of the date of Owner's personal receipt of the contract and [] the
> contract will not take effect if the facts have changed.

(Doc. 16-1 at 24 (citing Doc. 16-5, Policy with attached Application, at 42-69; Doc. 16-5 at 68).)

Therefore, because on May 20, 2016 the answers to Questions 5(i) and 7(d) were no longer true

and correct, Transamerica argues that it is an undisputed fact that the Policy never took effect.

(Doc. 16-1 at 23.)  As such, Transamerica argues it is entitled to summary judgment. (Doc. 16-1

at 23.)

    2.  Estate's response in opposition

The Estate responds that the central issue is "whether Ms. Trahan believed that, by

advising Transamerica that she had a 'thyroid disorder' without also specifically providing that a

'thyroid nodule' was on her thyroid gland, she was making a material misrepresentation with the

intent to deceive." (Doc. 18 at 10.)

    *A.*  *Louisiana Revised Statute 22:860*

The Estate agrees that Transamerica's affirmative defense is provided under Louisiana

Revised Statute 22:860. To prove that affirmative defense, the Estate maintains that

Transamerica must show: (1) that the insured made a false statement in his insurance application;

(2) that the false statement was material; and (3) that the insured's false statement was made with

14

an "intent to deceive" the insurer. (Doc. 18 at 13 (citing *Grenoble House Hotel v. Hanover Ins. Co.*, No. 06-8840, 2010 WL 2985789, (E.D. La. July 26, 2010); *Smith v. Liberty Life Ins. Co.*, No. 11-3171, 2012 WL 6162757 (E.D. La. Dec. 11, 2012)).) The Estate outlines that the burden of proof falls on the insurer to prove each of the elements. (Doc. 18 at 14 (citing *Coleman v. Occidental Life Ins. Co. of N.C.*, 418 So. 2d 645 (La. 1982); *Ragan v. Pilgrim Life Ins. Co. of America*, 461 So.2d 618 (La. App. 1st Cir.1984)).)

The Estate argues that proving intent to deceive is rarely appropriate at the summary judgment stage. (Doc. 18 at 15.) Therefore, to show intent, "courts look to the surrounding circumstances indicating the insured's knowledge of the falsity of the representation made in the application and her recognition of the materiality of her misrepresentations, or to circumstances which create a reasonable assumption that the insured recognized the materiality." (Doc. 18 at 15 (citing *Jamshidi v. Shelter Mutual Ins. Co.*, 471 So.2d 1141, 1143 (La. App. 3d Cir. 1985)).)

### B. *Transamerica has failed to meet its burden*

The Estate argues that Transamerica has failed to meet its burden that Ms. Trahan misrepresented a material fact with the intent to deceive. (Doc. 18 at 16.) As to whether Ms. Trahan made a misrepresentation in the Application, the Estate asserts that Transamerica omits that as to Question 7 – whether she had had or been advised to have diagnostics tests or studies – is prefixed with "OTHER THAN WHAT YOU HAVE ALREADY DISCLOSED." (Doc. 18 at 17.) Therefore, Question 7 seeks only information that has not been disclosed in previous answers. The Estate argues that because Ms. Trahan disclosed she had a thyroid disorder and identified her treating physicians in her other responses, there was no other information she needed to disclose in Question 7. (Doc. 18 at 17-18.)

Further, regarding Question 5 and whether Ms. Trahan should have further disclosed information regarding the treatment of her thyroid disorder, the Estate argues that Ms. Trahan's

answers do not evince an intent to deceive because she disclosed her thyroid condition, the date

of onset in 1987, and identified her treating physician. (Doc. 18 at 17.) These disclosures,

according to the Estate, do not paint a picture of good health or intentionally misrepresent the

truth to deceive Transamerica by representing the thyroid condition was under control. (*Id.*)

Instead, the Estate explains that Ms. Trahan answered Question 5 to the extent of her knowledge

relating to her condition. (*Id.*) Therefore the Estate concludes that the undisputed material facts

do not show that Ms. Trahan misrepresented her medical history on the Application. (Doc. 18 at

17-18.)

C.  <u>Summary judgment is inappropriate for this matter</u>

The Estate argues that intent to deceive as a subjective fact is inappropriate at summary

judgment because the Court cannot weigh evidence or make credibility determinations. (Doc. 18

at 18.) Further, because the intent to deceive element can only be proven by circumstantial

evidence relating to a deceased woman's state of mind, the Estate argues that courts are wary of

resolving fact issues involving the decedents state of mind. (Doc. 18 at 18 (citing *Guillory v.

Domtar Indus. Inc. v. John Deere Co.*, 95 F. 3d 1320, 1326 (5th Cir. 1996) ("Summary judgment

is rarely proper when an issue of intent is involved")).) In considering intent, the Estate asserts

that the Court should consider "circumstances indicating the insured's knowledge of the falsity of

the representation made in the application and the insured's recognition of the materiality of his

misrepresentations, or to circumstances which create a reasonable assumption that the insured

recognized the materiality." (Doc. 18 at 18 (citing *Watson v. United of Omaha Life Ins. Co*., 735

F. Supp. 684, 685 (M.D. La. 1990)).) The Estate details that there are genuine issues of material

fact regarding the question of intent and therefore, summary judgment is inappropriate.

3.  <u>Transamerica's reply</u>

In reply, Transamerica argues that the sole issue before the Court on summary judgment is "whether Ms. Trahan's response to Question 7(b) in the Application was a material misrepresentation made with the intent to deceive Transamerica." (Doc. 19 at 1.) Transamerica points out that the Estate failed to controvert the undisputed material facts with record evidence in violation of Local Rule 56(f), which means that the undisputed material facts must be deemed admitted for the purposes of summary judgment. (Doc. 19 at 1-2; and at 3 (citing *Simmons v. Greyhound Lines, Inc.*, No. 18-272-SDD-EWD, 2020 U.S. Dist. LEXIS 1119, at *3 (M.D. La. Jan. 6, 2020) ("The Court will deem admitted Defendant's Statement of Undisputed Facts that are not contradicted by specific record evidence and to which the Court is specifically directed."); *Bailey v. E.B.R. Parish Prison*, No. 12-0224-JJB-RLB, 2015 U.S. Dist. LEXIS 109688, at *21 (M.D. La. Aug. 18, 2015) (deeming undisputed material facts admitted where plaintiff failed "to designate specific evidence in the record of sufficient caliber and quantity to create a genuine issue for trial").).

Transamerica challenges the Estate's argument that Ms. Trahan was not required to provide more information on the Application beyond the disclosure of her "thyroid disorder" and that she was not on any medications. Transamerica states that the Estate's arguments lack evidentiary support because the undisputed facts show that Ms. Trahan was aware of the extent of her thyroid condition, concerned about the growing nodule, and had expressed concerns to her physician in 2015. (Doc. 19 at 2-3.) Because the Estate's speculation regarding Ms. Trahan's knowledge is not supported by the evidentiary record—but instead by conclusory, self-serving arguments—Transamerica states that the Estate cannot defeat summary judgment.

### A.  *The undisputed material facts establish a misrepresentation*

In reply, Transamerica reiterates that Ms. Trahan's response to Question 7(b) was a misrepresentation. (Doc. 19 at 3.) Transamerica disputes that the response to Question 5(f)

stating: "Thyroid disorder, 1987 to present, Meds off and on, 0 med now" and listing the name of her treating endocrinologist was sufficient to show that she was getting diagnostic testing for a growing thyroid nodule or that she was scheduled to see a surgeon to discuss the thyroid nodule the following day. (Doc. 19 at 4.) Transamerica maintains that the disclosure of the thyroid disorder does not justify responding "No" to whether she "[h]ad or been advised to have an x-ray, electrocardiogram, laboratory test or other diagnostic study." (Doc. 19 at 5.) Further, Transamerica argues that because she did not disclose that the nodule was growing or that she was consulting on surgical options, the Estate cannot use her incomplete response to Question 5(f) to insulate her failure to disclose the diagnostic testing in Question 7(b). (Doc. 19 at 6.)

To the extent that the Estate argues that Ms. Trahan was unaware of her prior diagnostic testing, Transamerica urges the Court to ignore that argument as absurd. (Doc. 19 at 6.) The extent of the diagnostic testing and the fact that she shared the tests with the surgeon, Dr. Kandil, provides evidence that Ms. Trahan was aware that she had diagnostic tests. (Doc. 19 at 6-7.)

### B.  *The undisputed material facts establish materiality*

Transamerica points out that the Estate did not provide any evidence to contradict the fact that Ms. Trahan's misrepresentation was material. (Doc. 19 at 7.) Transamerica also reiterates its arguments based on the corporate representative's deposition and the underwriting guidelines. (Doc. 19 at 7-8.)

### C.  *The undisputed material facts establish an intent to deceive*

Transamerica states that the Estate does not provide any evidence of Ms. Trahan's intent and merely argues that it is rarely appropriate to decide intent at summary judgment. (Doc. 19 at 8.) Transamerica maintains that the Fifth Circuit's 1996 decision in *Guillory v. Domtar Indus. Inc. v. John Deere Co.*, 95 F.3d 1320 (5th Cir. 1996), cited by the Estate, does not support the Estate because the Fifth Circuit affirmed the grant of summary judgment in *Guillory*. (Doc. 19 at

8.) Transamerica posits that intent to deceive can be inferred from the circumstances and that the Court should consider the extent of the misrepresented medical treatment as indicative of an intent to deceive. (Doc. 19 at 9 (citing *Jordan v. Life General Security Ins. Co.*, 333 So. 2d 732 (La. App. 4 Cir.), *writ denied*, 337 So. 2d 219 (La. 1976)).) Because the extent of the omitted facts has not been controverted by the Estate, Transamerica maintains that the Court can grant summary judgment on the issue of intent to deceive. (Doc. 19 at 9-10.)

> D. <u>Summary judgment is warranted because Ms. Trahan's answers were not true and complete as of the date she received the policy.</u>

Transamerica reiterates that because Ms. Trahan's medical condition had changed, and she had had two surgeries between the time she filed her Application and she received the Policy, the Policy never took effect under the plain terms of the Application, as incorporated into the Policy. (Doc. 19 at 10.)

*b.  Applicable Law*

The parties agree that Louisiana Revised Statute 22:860, entitled, *Warranties and misrepresentations in negotiation; applications*, governs Transamerica's affirmative defense that it "is not liable for the death benefit provided by its policy if the insurer can show that the policy was void *ab initio* because of misrepresentations made by the insured in his application for insurance." *Smith v. Liberty Life Ins. Co.*, No. CIV.A. 11-3171, 2012 WL 6162757, at *2 (E.D. La. Dec. 11, 2012). Louisiana Revised Statute 22:860 states:

> A. Except as provided in Subsection B of this Section, R.S. 22:1314, and 1315, no oral or written misrepresentation or warranty made in the negotiation of an insurance contract, by the insured or in his behalf, shall be deemed material or defeat or void the contract or prevent it attaching, unless the misrepresentation or warranty is made with the intent to deceive.
>
> B. In any application for life, annuity, or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any

such statement shall not bar the right to recovery under the contract unless either one of the following is true as to the applicant's statement:

(1) The false statement was made with actual intent to deceive.

(2) The false statement materially affected either the acceptance of the risk or the hazard assumed by the insurer under the policy.

La. R.S. 22:860.[1]

Interpreting Louisiana Revised Statute 22:860, "[i]t is well-settled that an insurer seeking to invoke this affirmative defense has the burden of proving three elements: (1) that the insured made a false statement in his insurance application; (2) that the false statement was material; and (3) that the insured's false statement was made with an 'intent to deceive' the insurer." *Smith v. Liberty Life Ins. Co.*, No. CIV.A. 11-3171, 2012 WL 6162757, at *2 (E.D. La. Dec. 11, 2012).

"Under Louisiana law, a misrepresentation is material if the truth would have resulted in the insurer not issuing the policy of insurance or issuing the policy at a higher rate." *Middleton v. GEICO Ins. Co.*, No. CV 19-09116, 2019 WL 5190997, at *2 (E.D. La. Oct. 15, 2019) (internal citations omitted); *Jamshidi v. Shelter Mut. Ins. Co.*, 471 So. 2d 1141, 1143 (La. Ct. App. 1985) (" 'Material' means that the statement must have been of such a nature that, had it been true, the insurer either would not have contracted or would have contracted only at a higher premium rate.")  Therefore "[e]ven if the information given by the applicant were false, if the insurance company would have issued the policy anyway, then it is not material."  *Jamshidi*, 471 So. 2d at 1143.

Further, under Louisiana law, "strict proof of fraud is not required to show intent to deceive" and instead intent to deceive may be inferred from the surrounding circumstances. *State*

---

[1] La. R.S. § 22:860 was formerly cited as La. R.S. § 22:619. Pursuant to Act No. 415 of 2008, the Louisiana legislature redesignated and renumbered La. R.S. § 22:619 as La. R.S. § 22:860, effective Aug. 15, 2008.

*Farm Mut. Auto. Ins. Co. v. Bridges*, 45,162 (La. App. 2 Cir. 5/19/10), 36 So. 3d 1142, 1147.

Therefore, the Court should look to, "circumstances which indicate the insured's knowledge of

the falsity of the representations made in the application and his recognition of the materiality

thereof, or from circumstances which create a reasonable assumption that the insured recognized

the materiality of the misrepresentations." *Id.*; *see Jamshidi v. Shelter Mut. Ins. Co.*, 471 So. 2d

1141, 1143 (La. Ct. App. 1985).

As the Estate points out "because the 'intent to deceive' element can only be proven with

circumstantial evidence, it is not easily established at the summary judgment stage." *Smith v.*

*Liberty Life Ins. Co.*, No. CIV.A. 11-3171, 2012 WL 6162757, at *3 (E.D. La. Dec. 11, 2012);

*see Guillory v. Domtar Indus. Inc. v. John Deere Co.,* 95 F.3d 1320, 1326 (5th Cir.1996)

("Summary judgment is rarely proper when an issue of intent is involved."). However, "the

allegation of intent does not spontaneously shield a case from summary judgment." *Guillory v.*

*Domtar Indus. Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996). Instead, "the case must be evaluated like

any other to determine whether a genuine issue of material fact exist." *Id.* Indeed the Fifth

Circuit has explained:

> This is not to say that the court can never enter summary judgment when intent or
> state of mind is at issue, only that the court must recognize that undermining the
> moving party's professed state of mind is not a simple task. Therefore, the court
> must be vigilant to draw *every* reasonable inference from the evidence in the record
> in a light most flattering to the nonmoving party. Summary judgment, to be sure,
> may be appropriate, "[e]ven in cases where elusive concepts such as motive or
> intent are at issue, ... if the nonmoving party rests merely upon conclusory
> allegations, improbable inferences, and unsupported speculation."

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1266 (5th Cir. 1991).

*a.  Analysis*

1. Although the Estate did not technically comply with Local Rule 56(f), the Estate will be
   given leave to correct the record.

As Transamerica points out, the Estate failed to cite to any record evidence in *Plaintiff's Response to Defendant's Statement of Material Facts*. (Doc. 18-1 at 1-3.) However, the Estate did provide citations to record evidence in what it styled *Material Facts that Create a Genuine Dispute for Trial*. (Doc. 18-1 at 3-9.) As explained by Chief Judge Dick of this District, in opposing a motion for summary judgment, a party is required under Local Rule 56(b) to:

> submit with its opposition a separate, short, and concise statement of material facts. The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule. Each such statement shall begin with the designation "Admitted," "Denied," or "Qualified" and, in the case of an admission, shall end with such designation. The opposing statement may contain in a separately titled section additional facts, each set forth in a separately numbered paragraph and supported by a record citation as required by subsection (f) of this rule.

> As Plaintiff failed to comply with this rule, Defendant is correct that the Court must deem admitted its record-supported statements of undisputed fact. Rule 56(f) provides:

> > Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. An assertion of fact set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion. The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts.

*Simmons v. Greyhound Lines, Inc.*, No. 18-272-SDD-EWD, 2020 U.S. Dist. LEXIS 1119, at *1-3 (M.D. La. Jan. 6, 2020).

Although the Estate is not in strict compliance with the Local Rule, the violation is, under these circumstances largely technical. As this Court has done in the past, Plaintiff will be given seven days within with to supplement its opposition with a response to Transamerica's Statement of Undisputed Facts that is in compliance with the Rule.

> [T]he Court is entitled to consider Wal-Mart's Statement of Uncontested Facts admitted due to Plaintiff's failure to file a "separate, short and concise statement of the material facts as to which the opponent contends there exists a genuine issue to be tried," as is required by M.D. La. L.R. 56(b). However, case law recognizes that the Court can still consider record evidence to determine if there is a factual dispute. *See Smith v. Brenoettsy*, 158 F.3d 908, 910 (5th Cir. 1998) (holding, where plaintiff failed to oppose the motion for summary judgment, that facts in "Statement of Undisputed Facts" were admitted, "except to the extent that the 'facts' in the 'Statement of Undisputed Facts' are contradicted by 'facts' in other materials attached to his motion for summary judgment." (citation omitted)); *Porter v. Dauthier*, No. 14-41, 2015 WL 5611647, at *8, *13 (M.D. La. Sept. 23, 2015) (deGravelles, J.) (relying on *Smith* and holding, when Plaintiff's opposition left "no doubt about his disagreement with either the basis or import of each of Plaintiff's undisputed facts," that Plaintiff would have forty-eight hours from the issuance of the ruling to comply with the Local Rule, and ultimately denying the motion for summary judgment).

*Braud v. Wal-Mart Stores, Inc.*, No. 3:17-CV-320-JWD-EWD, 2019 WL 3364320, at *4 (M.D. La. July 25, 2019).

2.  <u>There are genuine issues of disputed fact as to whether Ms. Trahan made a material misstatement with the intent to deceive Transamerica</u>

While Ms. Trahan's medical records leave little in doubt as to her complaints and treatment before and after she applied for and received the life insurance policy, there are genuine disputes regarding whether Ms. Trahan made a material misstatement with the intent to deceive Transamerica. Ms. Trahan answered Question 7(b), which asks, "*other than what you have already disclosed*, within the past five years have you: . . . b. Had or been advised to have an X-ray, electrocardiogram, laboratory test or other diagnostic study?" with a simple "No." (emphasis added). But Ms. Trahan had previously disclosed in answer to Question 5(f): "Thyroid disorder, 1987 to present, Meds off and on, 0 med now" and had also the disclosed the identity of her doctor who had treated her for this condition. Thus, a reasonable jury could conclude that she was not obliged to further explain any diagnostic tests relating to her thyroid disorder and did not intend to deceive Transamerica. This is particularly true since a) it is Transamerica's burden to establish her intent to deceive, b) this Court must "draw[ ] all inferences in favor of the

nonmoving party," *International Shortstop, Inc*., 939 F.2d at 1263, and c) the question of intent is rarely appropriate for the Court to resolve at summary judgment. *Guillory v. Domtar Indus. Inc. v. John Deere Co.,* 95 F.3d 1320, 1326 (5th Cir.1996) ("Summary judgment is rarely proper when an issue of intent is involved.")  This is not a case where the nonmovant "rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Int'l Shortstop, Inc*, 939 F.2d at 1266 (internal citations and quotation marks omitted).  The Estate has pointed the Court to evidence that Ms. Trahan disclosed the thyroid disorder and her treating physician, was hyper focused on her weight and not the nodule and had not received a cancer diagnosis when she submitted her Application for the Policy. Drawing all inferences in favor of Ms. Trahan, the Court concludes that there are genuine factual disputes a jury must resolve regarding whether Ms. Trahan intended to deceive Transamerica by answering "No" to Question 7(b).

For the same reasons, the Court finds that there is a genuine dispute of fact as to whether Ms. Trahan intended to deceive Transamerica by her answer to Question 5(i), which asked whether she had ever been diagnosed with or treated for a "[c]ancer, tumor, polyp or cyst". Ms. Trahan had not been diagnosed definitively with cancer at the time of her application and a reasonable jury might well conclude that she understandably considered a "nodule" different from a "tumor, polyp or cyst." Similarly, with respect to Question 7(d) (asking whether she "[h]ad been advised to have a surgical procedure" within the past five years), Ms. Trahan answered "No." For the same reasons, the Court finds that there is a genuine dispute of fact as to whether Ms. Trahan intended to deceive Transamerica by her answer of "No." Further, at the time she filed her application, her treating physicians had not recommended surgery to address the thyroid nodule.

Having concluded that there are genuine factual disputes concerning whether Ms. Trahan made material misstatements with the intent to deceive when she answered "No" to Questions 7(b), 7(d) and 5(i), the Court finds that summary judgment on this issue is not appropriate.

3. <u>Genuine issues of material fact preclude summary judgment on the issue of whether Ms. Trahan's subsequent condition and treatment prevented the Policy from taking effect.</u>

Transamerica argues that summary judgment is appropriate because the terms of the Application, as incorporated into the Policy, provide:

> **I/we agree** . . . any contract issued on this application shall not take effect until after all of the following conditions have been met: (a) the full first premium is paid in full, (b) the Owner has personally received the contract during the lifetime of and while the Proposed Insured is in good health, and (c) all of the statements and answers given in this application must be true and complete as of the date of Owner's personal receipt of the contract and that the contract will not take effect if the facts have changed.

(Doc. 16-5, Policy with attached Application, at 59.) Transamerica argues that under this clause, the policy did not come into effect because Ms. Trahan's answers to Question 5(i) and Question 7(d) were not true and complete when Ms. Trahan received the contract. Specifically, Transamerica contends that the answers to Question 5(i) and Question 7(d) were not true and correct because the undisputed material facts show that prior to receiving the Policy on May 20, 2016, Ms. Trahan was diagnosed with cancer and had undergone two surgeries on her thyroid.

While not articulated as such, Transamerica seems to argue that the continued truth of Ms. Trahan's answers was a suspensive condition or condition precedent of the contract and, those answers not being true when the Policy was received, the contract never came into effect. However, Transamerica does not cite any case law or provide any statutory citations to the Court in support of its position.

Generally, "[a]n insurance policy is a contract between the parties and should be construed employing the general rules of interpretation set forth in the Louisiana Civil Code."

*Estopinal v. Parish of St. Bernard,* 09–1382, p. 2 (La.App. 4 Cir. 2/24/10), 32 So.3d 991, 992. If

the policy wording at issue is clear and expresses the intent of the parties, the agreement must be

enforced as written. *Howard v. Protective Life Ins. Co.*, No. CIV.A. 04-1261, 2005 WL 887284,

at *4 (E.D. La. Apr. 13, 2005). Further, "[e]very insurance contract shall be construed according

to the entirety of its terms and conditions as set forth in the policy . . ." La. R.S. 22:654.

> Under Louisiana law, "a suspensive condition is the civil law analog of a condition
> precedent." *In re Myles,* (Bkrtcy.M.D.La.2008), 395 B.R. 599, 604. When an
> obligation is dependent upon a condition, "the right to enforce the obligation does
> not arise until fulfillment of the suspensive condition, and the obligation may not
> be enforced until the condition is met." *Hampton v. Hampton, Inc.,* 97–1779
> (La.App. 1 Cir.1998), 713 So.2d 1185, 1190. "When it has become certain that
> the suspensive condition will not occur ... the obligations are broken and the
> contract is null." *Guichard v. Greenup,* 259 So.2d 93, 94 (La.App. 1 Cir.1972).

*Foster v. United of Omaha Life Ins. Co.*, No. CIV.A. 08-1170, 2010 WL 3834047, at *6 (W.D.

La. Sept. 24, 2010), *aff'd,* 442 F. App'x 922 (5th Cir. 2011). *See also Holmes v. Jefferson Pilot*

*Fin. Ins. Co.*, 39,721 (La. App. 2 Cir. 6/29/05), 907 So. 2d 185, 189, *writ denied,* 2005-1985 (La.

2/3/06), 922 So. 2d 1185 ("A conditional obligation is one dependent on an uncertain event. If

the obligation may not be enforced until the uncertain event occurs, the condition is suspensive.

If the obligation may be immediately enforced, but will end when the uncertain event occurs, the

condition is resolutory. LSA–C.C. art. 1767.") "Louisiana courts do not construe stipulations in a

contract as suspensive conditions unless the express contract language compels such

construction." *Foster v. United of Omaha Life Ins. Co.*, 442 F. App'x 922, 927 (5th Cir. 2011)

(footnotes and internal quotations omitted).

    Louisiana courts have upheld good health clauses[2] as an enforceable suspensive condition

to a life insurance policy. *Howard*, 2005 WL 887284, at *4 (collecting cases). These clauses are,

---

[2] A "good health" clause is one in which the policy only becomes effective if the putative insured's health is not
significantly different on the day the policy is received than it was at the time of the application. An example of such

in some ways, are similar to the clause at issue here; but there is significant distinction between the two. The express language in the Transamerica Application states:

> **I/we agree** . . . any contract issued on this application shall not take effect until after all of the following conditions have been met. . .  (c) all of the statements and answers given in this application must be true and complete as of the date of Owner's personal receipt of the contract and that the contract will not take effect if the facts have changed.

(Doc. 16-5, Policy with attached Application, at 59.)

Because the purported suspensive condition is couched in terms of the truthfulness of the insured's answers and not his state of health, it implicates the statutory obligation of the insurer to prove not only that the earlier answers were false but were material and made with the intent to deceive. In *Foster*, the insurer attempted to avoid coverage of a life insurance policy based on a clause which stated "execution and delivery of this Addendum" is "a condition of delivery of this Policy" and "[i]ncorrect or misleading information provided herein may void this Policy from its effective date." *Foster v. United of Omaha Life Ins. Co.*, 442 F. App'x at 927. The addendum also stated that the insured had "no change in health" and had "not consulted a health care provider or been hospitalized" since the date of application. *Id.* at 925. The Court of Appeal affirmed the district court's fact finding that, even if the statements made by the applicant that he had not consulted a health care provider or been hospitalized since the application were untrue,[3] they had been made without an intent to deceive. *Id*. at 926. The Court then rejected the insurer's claim that the policy was not effective based on the untrue statements of the applicant for two reasons:

---

a clause is found in *Howard v. Protective Life Ins. Co.*, No. CIV.A. 04-1261, 2005 WL 887284, at *1 (E.D. La. Apr. 13, 2005) "No insurance shall take effect unless: ***
(3) there has been no change in health and insurability from that described in this application...."
[3] Two weeks after the applicant signed the application, she was seen by three physicians, prescribed several medications and was pronounced "at high risk for cardiovascular disease." *Id.* at 924-25.

The addendum further states: "Incorrect or misleading information provided herein *may* void this Policy from its effective date." (emphasis added). This permissive language does not expressly compel the construction that complete disclosure is a condition precedent to coverage. Further, the circumstances under which a misrepresentation enables an insurer to rescind a policy are set out in Louisiana law, as discussed *supra*. Because the district court did not commit clear error in finding that Warren had no intent to deceive United when she signed the addendum, Plaintiffs are entitled to recover under the policy.

*Foster*, 442 F. App'x at 927.

For our purposes here, it bears emphasis that, in connection with the second reason, the Court stated in note 12: "*See* La. Rev. Stat. § 22:860(A) (limiting the kinds of misrepresentations that 'shall be deemed material or defeat or void or *prevent* it attaching.'") (emphasis by the Fifth Circuit).

The Fifth Circuit, applying Texas law, drew a similar distinction between a good health clause and one relying on the truth or falsity of the insured's answers to determine whether an insurer could avoid coverage based on false information, or information which was once true but had become false. *See Qiuhong Liu v. Fid. & Guar. Life Ins. Co.*, 282 F. App'x 304, 307 (5th Cir. 2008) ("In other words, provisions in insurance policies that turn on the truth or falsity of answers in an insurance application are treated as representations. *Russell*, 119 S.W.3d at 281 (citing *Mayes*, 608 S.W.2d at 616). Alternatively, a "good health provision" that "expressly provides that coverage does not take effect unless the applicant is in good health" operates as a condition precedent. *Id*.").

Thus, whether Transamerica can avoid coverage based on information provided earlier by Ms. Trahan which, at the time she received the Policy was no longer true, hinges on a question of fact not appropriate for resolution by summary judgment, namely, whether or not the information was given by Ms. Trahan with an intent to deceive. That issue must be left for the jury.

<u>CONCLUSION</u>

Accordingly,

IT IS HEREBY ORDERED that the *Motion for Summary Judgment of Transamerica Life Insurance Company* (Doc. 16) filed by Transamerica Life Insurance Company is DENIED.

IT IS FURTHER ORDERED that Plaintiff is given seven days from the date of this ruling within which to supplement the record with a response to Defendant's Statement of Undisputed Facts that is in compliance with Local Rule 56(f).

Signed in Baton Rouge, Louisiana, on June 15, 2020.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**